*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RICHARD LEE COLEMAN, JR.,

        Defendant-Appellant.

UNPUBLISHED
June 09, 2026
2:46 PM

No. 369184
Oakland Circuit Court
LC No. 2023-283648-FC

Before: TREBILCOCK, P.J., and CAMERON and LIEVENSE, JJ.

PER CURIAM.

Defendant, Richard Lee Coleman, Jr., trafficked drugs and drug-dependent women from his houses in Pontiac. He raises many claims on appeal arising from convictions and sentences for criminal sexual conduct, human trafficking, accepting the earnings of a prostitute, and keeping a drug house. Although we affirm his convictions, some scoring errors by the trial court require us to vacate one of his sentences. We remand for further proceedings consistent with this opinion.

## I. EXPERT WITNESS TESTIMONY

The main issues on appeal concern addiction testimony by a physician and sex-trafficking testimony by a Michigan State Police officer. Defendant asserts their statements exceeded the scope of expert witness testimony under MRE 704 and thus invaded the province of the jury. He further maintains that his trial counsel's failure to object to this testimony constituted ineffective counsel. Neither have merit.

## A. OVERVIEW AND STANDARDS OF REVIEW

We note at the top the pertinent charges the prosecutor alleged (and the jury found) defendant committed:

- first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(f) (sexual penetration causing personal injury and using force or coercion);

- two counts of third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(b) (sexual penetration using force or coercion); and

- three counts of participating in a human trafficking enterprise, MCL 750.462d(b), resulting in bodily injury or being engaged in commercial sexual activity, MCL 750.462f(1)(b).

To support a conviction of CSC-I, the prosecutor must prove beyond a reasonable doubt that a defendant "(1) causes personal injury to the victim, (2) engages in sexual penetration with the victim, and (3) uses force or coercion to accomplish the sexual penetration." *People v Nickens*, 470 Mich 622, 629; 685 NW2d 657 (2004). CSC-III requires "(1) defendant engaged in sexual penetration with the victim, and (2) force or coercion is used to accomplish the sexual penetration." *People v Eisen*, 296 Mich App 326, 333; 820 NW2d 229 (2012) (cleaned up). Finally, a trafficking conviction under MCL 750.462d entails a defendant knowingly benefiting from participation in a criminal enterprise in which another individual engaged in commercial sexual activity. MCL 750.462d(b); MCL 750.462f(1)(b); MCL 750.159f(a).

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." MRE 704. But "there are limits on an expert's authority to offer an opinion that embraces an ultimate issue" to be decided by the trier of fact. *People v McFarlane*, 325 Mich App 507, 519; 926 NW2d 339 (2018). An expert witness may not, for example, "testify about the requirements of law which apply to the particular facts in the case or to phrase his opinion in terms of a legal conclusion." *Id*. (quotation marks and citation omitted).

In order to properly preserve an evidentiary issue for appellate review, a party must raise the issue at a time when the trial court can properly address it to alleviate any prejudice. *People v Butsinas*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 364778); slip op at 10. Raising an evidentiary issue for the first time in a posttrial motion does not give the trial court an opportunity to correct the error to avoid prejudice. *Id*. Because that is what defendant did, this evidentiary challenge is unpreserved; so, we review for plain error affecting substantial rights. *People v Anderson*, 341 Mich App 272, 279; 989 NW2d 832 (2022). "Under the plain-error rule, defendant bears the burden to prove (1) an error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights, i.e., prejudiced defendant by affecting the outcome of the proceedings." *Id*. (quotation marks and citation omitted).

In order to establish ineffective assistance of counsel, a defendant must demonstrate "(1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Abcumby-Blair*, 335 Mich App 210, 228; 966 NW2d 437 (2020). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018) (quotation marks and citation omitted). A defendant must meet a heavy burden to overcome the presumption that trial counsel employed an effective trial strategy. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009).

To preserve a claim of ineffective assistance of counsel, a defendant must raise the claim in a motion for a new trial or request for a *Ginther*[1] hearing. *People v Jackson (On Reconsideration)*, 313 Mich App 409, 431; 884 NW2d 297 (2015). Defendant did so, but because the trial court denied the motion, this Court's "review is limited to mistakes apparent from the record." *People v Miller*, 326 Mich App 719, 726; 929 NW2d 821 (2019). A claim of ineffective assistance of counsel involves mixed questions of law and fact. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). A trial court's findings of fact, if any, are reviewed for clear error. *People v Ogilvie*, 341 Mich App 28, 34; 989 NW2d 250 (2022). But whether the facts constitute a violation of the defendant's right to the effective assistance of counsel is a question of law that this Court reviews de novo. *Id.*

## B. DR. CARL CHRISTENSEN'S ADDICTION TESTIMONY

Defendant asserts that Dr. Carl Christensen, an addiction-medicine doctor qualified as an expert under MRE 702, erroneously opined that defendant's victims "were trafficked and could not consent to anything occurring around them" and that any sexual activity between the women and defendant was forced or coerced. Those conclusions, defendant claims, constituted inadmissible evidence. We do not agree.

At trial, Dr. Christensen explained the ways in which continued substance abuse becomes addiction and affects a user's brain. For example, he testified that an addict craves the substance she is abusing, compulsively uses the substance to the point of losing control over the amount of substance used, and continues to use the substance regardless of any negative consequences. When asked why the women who testified in this case may not have left defendant's home, Dr. Christensen opined that staying in a situation which provided a continuous supply of drugs was a strong incentive for them to stay. Dr. Christensen also stated that because the women's frontal cortices were compromised by the addiction, they were unable to control the impulse to continue use.

After thorough review of Dr. Christensen's testimony, we do not agree his testimony invaded the province of the jury. See *McFarlane*, 325 Mich App at 523. Simply, he did not express an opinion regarding defendant's guilt on these charges or the state of mind required to support them. He limited his testimony to explaining a medical addiction to a controlled substance and its effects on a user's brain. It is true that Dr. Christensen opined that some people stay in a situation because the continuous supply of drugs provides a strong incentive for them to do so, but we cannot agree with defendant that he testified that it was a scientific fact that the women could not resist defendant. Nor did Dr. Christensen testify that defendant knowingly provided the drugs to the women to subject them to prostitution or that he knowingly benefited from their services. Dr. Christensen merely opined that a steady supply of controlled substances can trigger a response in people's brains to stay where they are receiving the steady supply, which happened to be with defendant. It was then up to the jury, after considering all of the evidence, to determine whether defendant used force or coercion here. Dr. Christenson's testimony was not an expression of the

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

requirements of the statutes under which defendant had been charged, nor did Dr. Christensen voice a legal conclusion.

Nor can we agree Dr. Christensen offered "drug-profile evidence," which is "an informal compilation of characteristics often displayed by those trafficking in drugs." *People v Hines*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 363151); slip op at 8-9 (quotation marks and citations omitted). Dr. Christensen limited his testimony to addiction's effects on the brain and an abuser's corresponding actions, and did not rely on a "profile" to conclude that the women in this case were trafficked or were victims of criminal sexual conduct.

In sum, Dr. Christensen's testimony constituted proper expert witness testimony, and the trial court did not err, let alone plainly so, by admitting it. With this conclusion, we must also reject defendant's alternative argument that his trial counsel's failure to object to that testimony constituted deficient performance sufficient to support an ineffective-assistance-of-counsel finding because such a claim "cannot be predicated on the failure to make a frivolous or meritless motion." *People v Riley*, 468 Mich 135, 142; 659 NW2d 611 (2003).

### C. LIEUTENANT EDWARD PRICE'S HUMAN TRAFFICKING TESTIMONY

We next consider Lieutenant Edward Price's sex-trafficking expert testimony that defendant contends profiled him as a human trafficker.

Lieutenant Price defined a sex trafficker as an individual who exploits another individual to perform sexual acts for the trafficker's gain. When questioned about the significance of defendant sending messages to one of his victims (AM) when she was in drug treatment, Lieutenant Price testified that a trafficker might draw a person to him with promises to befriend or take care of the person because a trafficker's goal is to gain control over the individual to make money for the trafficker. Lieutenant Price also testified that drug and sex trafficking were often intertwined because the perpetrators used their supply of drugs to control the women that they were sex trafficking, and that was the pattern that played out here: defendant used drugs to control the victims in this case, in addition to offers of friendship or reciprocation of any emotion that the women may have felt toward defendant.

He also explained the hierarchy of trafficking groups like defendant's. Lieutenant Price testified that the exploiter is positioned at the top of the pyramid. Under the exploiter is the "bottom b**tch," who is the most trusted of the exploited women because she typically has been with the exploiter the longest. That victim might collect money, distribute drugs, supervise the women, and report their transgressions to the exploiter. But she is still controlled through violence and promises of drugs. When asked why someone in a situation like this does not leave, Lieutenant Price likened it to "domestic violence on steroids, because you have so many working parts of it." Lieutenant Price considered another of defendant's victims (ED) to be in this role.

Finally, Lieutenant Price testified that the women committing acts of prostitution to give defendant money for drugs established the element of fraud or coercion for sex or human trafficking. He thought that defendant's knowledge of the women's addictions gave defendant leverage to control them with his supply of drugs, and that defendant made his money selling drugs to the women that he controlled and trafficked through prostitution:

Yeah control, be it—you got to look at the totality of everything. Getting under his roof, the control of him over the food, control of how they went to the restroom, when they could go upstairs, downstairs. You have to look at everything.

So yes, he was in a place of authority over these girls. He knew their history. He knew they were addicts. He knew as long as he set up a few rules, be it the buying of drugs only from him, these girls didn't want to get dope sick, that they were gonna sell their bodies, and he was gonna profit and get the money.

Lieutenant Price additionally noted that the women were not paying rent, that it was a "typical pimp structure" in which the women gave defendant all the money and he took care of them as "their pimp," and that defendant having sex with the women was also common in trafficking cases.

Defense counsel did not object to this testimony, so we must review for plain error. And in our view, it was error to admit some of Lieutenant Price's testimony because it, at times, blurred the line between providing an expert opinion and "phras[ing an] opinion in terms of a legal conclusion." *McFarlane*, 325 Mich App at 519. That is, it moved from testimony explaining a profile or characteristics of a sex trafficking situation to testimony that defendant's circumstances and relationship with the women aligned with the profile and was substantive evidence of guilt. *People v Murray*, 234 Mich App 46, 52; 593 NW2d 690 (1999). And his counsel performed deficiently by failing to challenge Lieutenant Price's testimony that defendant's acts constituted sex trafficking. *Abcumby-Blair*, 335 Mich App at 228.

For example, Lieutenant Price's testimony suggested evidence of substantive guilt when he testified that defendant was employing a "typical pimp structure" and that his use of drugs to control the women satisfied the force or coercion element of the trafficking statute. This testimony "expressly compare[d] the defendant's characteristics to the profile in such a way that guilt [wa]s necessarily implied." *Murray*, 234 Mich App at 57. He also opined on the basis of the characteristics of a sex trafficker and concluded that defendant was a sex trafficker, *id*. at 61, directly testifying that defendant made his money selling drugs to women whom he controlled and trafficked through their acts of prostitution. This testimony amounted to a declaration that defendant created and knowingly benefitted from an enterprise by selling drugs to these women and from their engagement in commercial sexual activity. MCL 750.462d(b). In sum, by directly testifying that defendant made his money selling drugs to the women to control and traffic them, Lieutenant Price improperly offered his opinion on defendant's intent and his criminal responsibility. *McFarlane*, 325 Mich App at 523.

We thus must next decide whether the admission of the testimony affected defendant's substantial rights, *Anderson*, 341 Mich App at 279, and whether "there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different," *Abcumby-Blair*, 335 Mich App at 228. See *Hines*, ___ Mich App at ___; slip op at 10. It did not.

Looking beyond Lieutenant Price's testimony, the admissible evidence strongly supported defendant engaged in trafficking. First, defendant's victims testified he knowingly benefited financially from their commercial sexual activity. ED, for example, stated that after defendant asked her to move in with him, defendant discovered that she used both cocaine and heroin, but he only sold cocaine. So he began selling heroin to supply ED. She also testified that if defendant

-5-

knew the women had money, he charged them rent in the amount of money that they had. Similarly, AM asserted that after her "date" with undercover officers in one of the houses, she kept $30 for herself and gave the rest to defendant.

Second, defendant testified that he knew that the women were prostitutes. He controlled the drugs that they needed and knew that, as a result of their addiction, their work options were limited, except for prostitution. Although defendant testified that the women only paid him for drugs and rent, ED testified that the amount of rent varied. Defendant controlled their movement, and the women testified that they very rarely left the house; contemporaneous messages confirmed that they regularly informed defendant of their daily actions. He also controlled them with fear, as ED, AM, and another victim (FC) described beatings and sexual assaults.

Finally, law enforcement officials testified concerning the activities on all of the participants' Cash App accounts and the amount of money that ran through them. Although Lieutenant Price impermissibly made connections between defendant and a trafficking profile, the jury had sufficient evidence to conclude that defendant had trafficked ED, FC, and AM.

For these reasons, Lieutenant Price's testimony did not prejudice defendant by affecting the outcome of the proceedings, and there is not a reasonable probability that, but for Lieutenant Price's testimony, the outcome of the proceedings would have been different. Defendant, therefore, fails to demonstrate plain error affecting his substantial rights or that he is entitled to relief on the basis of ineffective assistance of counsel.

## II. UNANIMITY INSTRUCTION

Defendant next argues that the trial court erred by failing to read the jury a specific unanimity instruction and that he was denied the effective assistance of counsel by his trial counsel's failure to request such an instruction. We disagree.

## A. OVERVIEW AND STANDARD OF REVIEW

Criminal defendants have the right to a unanimous jury verdict. *People v Chelmicki*, 305 Mich App 58, 67; 850 NW2d 612 (2014); MCR 6.410(B). "In order to protect a defendant's right to a unanimous verdict, it is the duty of the trial court to properly instruct the jury regarding the unanimity requirement." *Chelmicki*, 305 Mich App at 67-68 (quotation marks and citation omitted). The trial court usually provides the jury with a general instruction on unanimity. *Id*. at 68. "However, a specific unanimity instruction may be required in cases in which more than one act is presented as evidence of the actus reus of a single criminal offense and each act is established through materially distinguishable evidence that would lead to juror confusion." *Id*. "[W]hen a statute lists alternative means of committing an offense which in and of themselves do not constitute separate and distinct offenses, jury unanimity is not required with regard to the alternate theory." *Id*. (quotation marks and citation omitted). Jury instructions "must include all elements of the charged offenses and any material issues, defenses, and theories if supported by the evidence." *People v McGhee*, 268 Mich App 600, 606; 709 NW2d 595 (2005).

"To preserve an instructional error for review, a defendant must object to the instruction before the jury deliberates." *People v Gonzalez*, 256 Mich App 212, 225; 663 NW2d 499 (2003).

Defendant did not object to or request a specific unanimity instruction before the jury deliberated, so we review this unpreserved claim of error for plain error affecting substantial rights. *Anderson*, 341 Mich App at 279. Defendant argues otherwise, claiming that his raising of the issue in a post-judgment motion preserved it for review. That cannot be, for an objection in the lower court is necessary to allow the trial court to properly address and correct an issue when it arose. *People v Carines*, 460 Mich 750, 765; 597 NW2d 130 (1999).

## B. ANALYSIS

Defendant argues that because the necessary element of "personal injury" for CSC-I could be established by a physical injury or mental anguish, and the prosecutor's theories of physical injury and mental anguish differed, the trial court should have instructed the jury that it was required to unanimously decide whether defendant had inflicted a physical injury or mental anguish.[2] We disagree.

Jury instructions "must include all elements of the charged offenses and any material issues, defenses, and theories if supported by the evidence." *McGhee*, 268 Mich App at 606. One of the elements of CSC-I is that a defendant "causes personal injury to the victim." *Nickens*, 470 Mich at 629. Personal injury is defined as "bodily injury, disfigurement, mental anguish, chronic pain, pregnancy, disease, or loss or impairment of a sexual of reproductive organ." MCL 750.520a(n).

"[B]odily injury and mental anguish are not alternative theories upon which a jury is required to make independent findings . . . ." *People v Asevedo*, 217 Mich App 393, 397; 551 NW2d 478 (1996). This is because "[w]hen a statute lists alternative means of committing an offense which in and of themselves do not constitute separate and distinct offenses, jury unanimity is not required with regard to the alternate theory." *Id*. MCL 750.520a(n) provides several examples of personal injury and "should not be construed to represent alternative theories upon which jury unanimity is required." *Id*. Therefore, personal injury is proven if there was sufficient evidence to establish any of the definitions of personal injury contained in MCL 750.520a(n). *Id*.

Here, the trial court instructed the jury that in order to find defendant guilty of CSC-I, it had to find beyond a reasonable doubt that defendant penetrated AM's genital opening with his penis and that defendant caused personal injury to AM. Although the trial court defined personal injury consistent with the statute, it did not instruct the jury that it had to reach a unanimous verdict as to whether AM suffered physical injury or mental anguish.

Doing so was not error. AM's testimony supported the CSC-I charge. She testified that after defendant sexually assaulted her, she experienced extreme pain in her lower abdomen that

---

[2] Defendant's appellate brief includes two paragraphs regarding a unanimity instruction as to the trafficking charges, but he did not include the trafficking charges in his statement of questions presented. He has thus forfeited our consideration of that issue. *People v Bennett*, 290 Mich App 465, 484 n 4; 802 NW2d 627 (2010).

persisted over the next one or two weeks and that her entire torso was sore. Moreover, the incident left her feeling depressed, she was prescribed medication for depression and anxiety, and she did not want to think about or discuss the incident because it still brought up negative feelings. Although defendant argues that AM's testimony was unclear as to whether her injuries were caused by the sex with defendant or the sexual assault committed by another man later the same day, he does not argue that the evidence supporting the element of personal injury was insufficient. And as set forth, AM testified regarding her physical and emotional state after defendant's assault before she began testifying about the assault that occurred later that night. Defendant fails to establish plain error or denial of the effective assistance of counsel.

## III. SENTENCING

The last remaining issues concern defendant's sentences. The trial court sentenced defendant as fourth-offense habitual offender, MCL 769.12, to 75 to 120 years in prison for the CSC-I conviction, MCL 750.520b(1)(f); 87 to 290 months in prison for the accepting the earnings of a prostitute convictions, MCL 750.457; 18 to 50 years for the human trafficking convictions, MCL 750.462d(b), MCL 750.462f(1)(b); 99 months to 320 months for the CSC-III convictions, MCL 750.520d(1)(b); and 7 months to 15 months for the maintaining a drug house convictions, MCL 333.7405(1)(d) and MCL 333.7406. He raises scoring and proportionality issues concerning his CSC-I conviction.

## A. OFFENSE VARIABLES

We begin with defendant's scoring challenges to offense variable (OV) 4, OV 7, OV 8, and OV 11, all relating to defendant's sexual assault of AM.

The trial court scored defendant on the basis of a prior record variable score of 150 points and a total OV score of 135 points. Coupled with his status as a fourth-offense habitual offender, the sentencing guidelines recommended a minimum sentence of 270 to 900 months' imprisonment. MCL 777.62; MCL 777.21(3)(c). Defendant is only entitled to resentencing if scoring errors alter the guidelines range. *People v Francisco*, 474 Mich 82, 88-89; 711 NW2d 44 (2006). That means he must demonstrate that the trial court's scoring errors regarding the challenged OVs equaled at least 36 points. See MCL 777.62.

We review a trial court's factual determinations when scoring the sentencing guidelines for clear error. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Clear error occurs if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *People v Johnson*, 502 Mich 541, 565; 918 NW2d 676 (2018). This Court reviews de novo the trial court's application of the facts to the law, *Hardy*, 494 Mich at 438, and "[t]he proper interpretation and application of the statutory guidelines," *People v Armstrong*, 305 Mich App 230, 242; 851 NW2d 856 (2014).

### 1. OV 4

OV 4 pertains to a psychological injury to a victim. A trial court is directed to score 10 points if "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a). A "trial court may assess 10 points for OV 4 if the victim suffers, among other

-8-

possible psychological effects, personality changes, anger, fright, or feelings of being hurt, unsafe, or violated." *Armstrong*, 305 Mich App at 247. And that is what the trial court did here as it relates to AM.

On appeal, defendant argues that was erroneous because AM's psychological injury could have been caused by another man's later sexual assault, or her lifestyle before she met defendant. The record developed at trial provides otherwise. AM testified that she was depressed after defendant's assault, expressing that she preferred not to think or talk about it because it continued to bring up negative feelings. She also noted that after the assault, she no longer felt safe around men and began taking medications to address her feelings of depression and anxiety. This testimony adequately demonstrated that she had suffered a psychological injury requiring psychological treatment; thus, the trial court properly assessed 10 points for OV 4.

### 2. OV 7

Defendant next objects to the trial court's 50-point assessment under OV 7 for aggravated physical abuse. This contention has merit.

MCL 777.37(1)(a) governs the score for aggravated physical abuse and provides a 50-point assessment if the defendant treated a victim "with sadism, torture, excessive brutality or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." See also *People v Lydic*, 335 Mich App 486, 496-497; 967 NW2d 847 (2021). "[E]xcessive brutality means savagery or cruelty beyond even the 'usual' brutality of a crime." *People v Glenn*, 295 Mich App 529, 533; 814 NW2d 686 (2012), rev'd on other grounds by *Hardy*, 494 Mich at 448.

The trial court scored defendant under OV 7 related to his sexual assault of AM. Again, she testified that defendant called her into his room because he wanted to have sex with her; she tried to offer him money, but he told her to put the money away. AM did not want to have sex with defendant because it was painful, and defendant was always rough. But she acceded to his demands, and experienced pain when defendant penetrated her. She explained that she did not refuse because "having sex with him or doing whatever he wanted me to do" was part of the cost of living in defendant's home. So she just "tr[ied] . . . to like just get through it," but her body tensed up; AM thought that she must not have been doing what defendant wanted her to do because he was upset and told her to leave his room. He swore and threw a flip flop at her, hitting her in the head. AM returned to her room. She was happy that it was over, but defendant entered her room about one or two minutes later and again engaged in sexual penetration.

Although AM described a painful sexual assault, her testimony does not establish excessive brutality and savagery. *Id*. The prosecution contends otherwise, pointing to defendant following her into her room to assault her again. But OVs can only be scored for conduct occurring after the commission of the sentencing offense if the OV specifies the scope of conduct. *People v McGraw*, 484 Mich 120, 125; 771 NW2d 655 (2009). CSC-I requires a sexual penetration, which defendant completed before AM left his room. Furthermore, MCL 777.37 does not provide for consideration of conduct that occurred after the offense. Rather, it focuses on conduct inflicted on a victim "during the offense." Accordingly, the trial court erred by assessing 50 points for OV 7.

### 3. OV 8

Defendant next argues that the trial court erred in its scoring of OV 8, which concerns the asportation or captivity of the victim. We again agree.

MCL 777.38(1)(a) provides for a 15-point assessment under OV 8 when "[a] victim was asported to another place of greater danger or to a situation of greater danger or was held captive beyond the time necessary to commit the offense." Asportation means "the act of carrying away or removing (property or a person)." *People v Barrera*, 500 Mich 14, 17; 892 NW2d 789 (2017) (quotation marks and citation omitted). Put differently, OV 8 applies "[i]f a victim is carried away or removed 'to another place of greater danger or to a situation of greater danger. . . .' *Id*. at 21.

The trial court scored OV 8 based on defendant telling AM to leave his room, then following her into her room. Lacking, however, was any evidence that AM's bedroom was a place of greater danger than defendant's room, or that defendant held AM captive for longer than it took for him to penetrate her. Nonetheless, the prosecution argued that the penetration underlying the CSC-I conviction was the first penetration, and that the second penetration in AM's bedroom held her captive beyond the time necessary to commit the offense. The trial court agreed, finding that by the time that AM left defendant's room she no longer had the will to do anything voluntarily.

That was error. Most OVs are offense-specific, are scored on the basis of the sentencing offense, and can only be scored for conduct occurring after the commission of the sentencing offense if the OVs specify the scope of conduct. *McGraw*, 484 Mich at 124-125. Here the assault that occurred in AM's bedroom occurred after the commission of the underlying crime (CSC-I) when he first penetrated her. So it matters not that OV 8 provides for conduct occurring after the commission of the crime if AM "was held captive beyond the time necessary to commit the offense." MCL 777.68(1)(a).

For these reasons, the trial court improperly assessed 15 points for OV 8.

### 4. OV 11

The last scoring issue concerns criminal sexual penetration under OV 11. MCL 777.41(1) scores points based on the number of criminal sexual penetrations: none (0 points), one (25 points), and two or more (50 points). It also states that the trial court should "[s]core all sexual penetrations of the victim by the offender arising out of the sentencing offense." MCL 777.41(2)(a). "Arising out of" is something that "springs from or results from something else, has a connective relationship, a cause and effect relationship, of more than an incidental sort with the event out of which it has arisen." *People v Johnson*, 474 Mich 96, 101; 712 NW2d 703 (2006).

The prosecution requested that the trial court assess 25 points for OV 11 for the additional penetration that occurred in AM's room after the first assault, despite having not charged defendant with a second CSC-I charge for the penetration that occurred in AM's room. Over defendant's contention that it was one continuous sexual act, the trial court applied 25 points under OV 11. That was not erroneous.

AM testified that defendant sexually penetrated her twice on the same day within minutes, in his room first and shortly thereafter in hers. This second penetration arose out of the penetration underlying the sentencing offense. AM testified that defendant was angry with her when he told her to go to her room. When defendant followed her and penetrated her again, defendant was even more angry and aggressive. These two events reflect a cause-and-effect relationship: defendant was angry with AM the first time because she did not act as defendant wanted, and he seemingly followed her into her room to punish her. Because the second sexual penetration arose out of the first, the trial court did not err by assessing 25 points for OV 11.

* * *

As set forth above, scoring errors exceeding 36 points or more in this case would change defendant's sentencing guidelines. Cumulatively, the trial court's scoring decisional errors for OV 7 and 8 total 65 points, and he is entitled to relief because the reduction of defendant's OV scores move his guideline range from Level VI to Level V, see MCL 777.62, and his minimum guideline range from 270 to 900 months' imprisonment to 225 to 750 months' imprisonment. He is thus entitled to resentencing.

## B. PROPORTIONALITY

Finally, defendant argues that his sentence for the CSC-I conviction was unreasonable. Because we are remanding for the trial court to resentence defendant based on corrected OV 7 and 8 scores as set forth, we do not address this alternative argument. This issue, if it remains, may be addressed after resentencing.

## IV. CONCLUSION

For these reasons, we affirm defendant's convictions but vacate his sentence for CSC-I, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Christopher M. Trebilcock
/s/ Thomas C. Cameron
/s/ Andrew J. Lievense